**Ardelbert FLOURNOY and Carline Flournoy, Plaintiffs,**

v.

**Walter PEYSON and William Joseph, Defendants.**

**No. 87 C 4849.**

United States District Court, N.D. Illinois, E.D.

Dec. 5, 1988.

James L. Schwartz, Fuchs, Temple & Berman, Chicago, Ill., for defendant William Joseph.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Ardelbert and Carline Flournoy (collectively "Flournoys") have sued Walter Peyson ("Peyson") and William Joseph ("Joseph"), asserting:

1. a violation of Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5 (collectively "Section 10(b)") arising out of Flournoys' purchase from Peyson of securities in two corporations of which he was President;

2. a violation of Securities Act of 1933 ("1933 Act") § 17(a), 15 U.S.C. § 77q(a) ("Section 17(a)");

3. a violation of 1933 Act § 12(2), 15 U.S.C. § 77($l$)(2) ("Section 12(2)");

4. a claim against Joseph for aiding and abetting Peyson in a scheme to defraud in violation of all three of those securities laws;

5. violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), 1962(c) and 1962(d) (cited respectively by "Section" followed by the statute number);

6. common law fraud against Peyson and Joseph individually and against both working together in a scheme;

7. violations of the Illinois Securities Law of 1953 as currently amended, Ill. Rev.Stat. ch. 121½, ¶¶ 137.12(E), (F), (G) and (I); and

8. a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 262 and 270a.

Norman S. Lynn, Cary N. Goldberg, Joel D. Teibloom, Lynn & Levenstein, Ltd., Chicago, Ill., for plaintiffs.

Joseph alone [1] has moved to dismiss the Amended Complaint ("Complaint") under Fed.R.Civ.P. ("Rule") 9(b) and 12(b)(6).

---

1. In October 1987 Flournoys first reported they could not obtain service on Peyson within the time specified by Rule 4(j). Apparently Peyson is the classically mobile defendant—he is (or at least was) literally living in a car, and his present whereabouts are unknown. At the request of Flournoys' counsel from time to time, this Court has continued to enlarge the time for service pursuant to Rule 6(b)(1). As of the

Other investors allegedly injured in the same ways asserted by Flournoys had previously brought suit in *Clark v. Master–Sem,* 85 C 10272, a case initially assigned to the calendar of this Court's colleague, Honorable Ann Williams, and then reassigned to another of this Court's colleagues, Honorable James Alesia. Comparable motions to dismiss were filed in *Clark* and have since been under consideration by Judge Williams and then Judge Alesia.

While the substantive *Clark* motions were under consideration, an added motion —this time to reassign this case to Judge Alesia's calendar on relatedness grounds under this District Court's General Rule 2.31—was brought in *Clark.* Accordingly this Court deferred briefing and resolution of the dismissal motion in this case because of the prospect of its becoming telescoped with that in *Clark.*[2] After Judge Alesia then decided that no reassignment should take place, this Court advised counsel it would address the motion and requested briefing (though most of the parties' submissions have simply involved their incorporation by reference of the *Clark* briefing). For the reasons stated in this memorandum opinion and order:

1. Joseph's Rule 9(b) motion is granted in part and denied in part.

2. His Rule 12(b)(6) motion to dismiss the Section 10(b) and Section 17(a) claims and the corresponding aiding and abetting claims is granted in part and denied in part.

3. His motion to dismiss the Section 12(2) claim and its counterpart aiding and abetting claim is granted.

4. His motion to dismiss the RICO claims under Sections 1962(a) and 1962(d) is granted, but his motion to dismiss the Section 1962(c) claim is denied.

5. His motion to dismiss the common law fraud claims is denied.

6. This Court expresses no opinion on the motions to dismiss the claims of Illinois securities fraud and consumer fraud.

### Facts [3]

On April 8, 1984 Peyson—acting as agent for a number of corporations, including Miami Investment Seminars, Inc. ("Miami Investment")—entered into an agreement with Joseph Real Estate Investment Seminars, Inc. ("JRE"). Under the agreement:

1. Peyson's principals were granted the right to use JRE's institutional programs within certain geographical areas.

2. In turn, JRE became entitled to receive a fixed percentage of income from the seminar tuition.

Joseph was JRE's President and sole shareholder (¶ 12).

On March 11 Carline Flournoy had attended a real estate investment seminar taught by Joseph (¶ 8). During the seminar Joseph introduced Peyson to the audience, saying Peyson had a "good" investment offer for interested participants. Joseph regularly introduced Peyson at his seminars (¶ 9).

At the March 11 seminar Peyson spoke to the audience about the possibility of "investing in Joseph" (¶ 10). With Joseph's knowledge and approval, Peyson said he represented Joseph and he was planning national seminars featuring Joseph (*id.*).

Sometime between March 11 and May 17 Flournoys talked with Peyson. Peyson then represented he was authorized by Joseph to organize corporations that would provide seminars featuring Joseph. Again

---

writing of this opinion, personal jurisdiction has not been obtained over Peyson.

**2.** If the motion for reassignment had been granted, followed by an order of consolidation, Flournoys would have solved the problem posed by the elusive Peyson (see n. 1), for jurisdiction over his person was apparently obtained in *Clark* before Peyson commenced his nomadic habits.

**3.** Rule 12(b)(6) principles require this Court to accept as true all plaintiffs' well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor (*Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). All Complaint allegations will be cited "¶ —." Because all relevant events occurred in 1984, no year designations are included after the next sentence in the text.

Joseph approved of Peyson's representations (¶ 11).

During those conversations Peyson also "guaranteed" Flournoys' investment in the seminars would earn them "at least a 100% profit in a short time" (*id.*). Joseph knew of that representation too.

On May 17 Flournoys purchased from Peyson 1,850 Miami Investment shares for $19,998.50. On May 29 Flournoys paid Peyson $50,000 for 75 shares of Master–Sem Corporation ("Master–Sem") (¶¶ 13–14), which Peyson said owned the exclusive rights to present Joseph's seminars in 20 cities, charging approximately $400 per person in tuition. Joseph also approved of those representations (¶ 15).

Peyson then intermingled his personal accounts with the accounts of Master–Sem and Miami Investment (¶ 21). Joseph withheld sums from the operation of his seminars that were properly payable to Master–Sem and Miami Investment (¶ 22). Both corporations have ceased operations and the shareholders, including Flournoys, lost their investments (¶ 23).

### Rule 9(b) Motion

 Joseph Mem. 2 asserts Flournoys did not plead fraud in conformity with Rule 9(b). That Rule and Rule 8 convey very different messages. Rules 8(a) and (e) epitomize the skeletal notice-pleading approach that informed the original adoption of the Rules a half century ago,[4] while Rule 9(b) mandates "particularity" of pleading some specified matters, including "the circumstances constituting fraud."

During recent years the notice-pleading approach has been giving way to a greater judicial insistence on fact pleading—a movement to return to something more like the pre-Rules pleading regime via a gloss imposed by the judiciary—unfortunately without changing the language of Rule 8 at all.[5] Whether or not that is justified, it is certainly true that the decision as to which of the two roads (simplicity or particularity) the pleader must take from the intersection of Rules 8 and 9(b), and just how far down that road the pleader ought to travel, is not one capable of precise formulation. All too often the specific answer is a function of the extent to which the individual judge generally favors the original notice-pleading purpose of the Rules or is a devotee of fact-specific pleading instead.

In the Seventh Circuit the guiding formulation of the particularity requirement remains that in *Tomera v. Galt*, 511 F.2d 504, 509 (7th Cir.1975) (citation omitted), which said this in the securities fraud context:

> Her first amended complaint notified defendants of the nature of her claims, a rule 10b–5 securities fraud, and it alleged the details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants. This is enough. More information can be gathered through discovery.

As this Court put the Rule 9(b) standard in the same context in *Caliber Partners, Ltd. v. Affeld*, 583 F.Supp. 1308, 1311 (N.D.Ill. 1984) (citations omitted):

> To plead a cause of action for fraud, plaintiffs need not allege evidentiary details that will be used to support the claim at a later date.... They need only set forth the basic outline of the scheme, who made what misrepresentations and the general time and place of such misrepresentations.

But that description does not sanction a wholly amorphous type of allegation that fails to give meaningful content to the notion of "particularity" in its ordinary-language meaning—see *Mutuelle Generale Francaise Vie v. Life Insurance Co. of Pennsylvania*, 688 F.Supp. 386, 393 (N.D. Ill.1988) and its quotation from *McKee v. Pope Ballard Shepard & Fowle, Ltd.*, 604 F.Supp. 927, 930 (N.D.Ill.1985).

---

4. See also the bare-bones forms of complaint in the Rules' Appendix of Forms, as to which Rule 84 says:

> The forms contained in the Appendix of Forms are sufficient under the rules and are

intended to indicate the simplicity and brevity of statement which the rules contemplate.

5. See, e.g., Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure*, 86 Colum.L.Rev. 433 (1986).

Some of the Complaint's fraud allegations do satisfy Rule 9(b). Thus ¶ 9 says Joseph (during the March 11 seminar, ¶ 8) said Peyson "had a good investment offer available" to Joseph's listeners. Peyson's general statements about his plans with Joseph followed, and during later conversations with Flournoys (sometime before May 17, see ¶ 13 [6]) Peyson guaranteed them "at least a 100% profit in a short time" (¶ 11).

In short, Flournoys do specify both the "time, place and contents" of the misrepresentations and "the full nature of the transaction" (*McKee*, 604 F.Supp. at 930). There is nothing unclear about the Complaint—it does not, for example, fail to identify which defendant said what.

But two later allegations in the RICO claims do not meet the Rule 9(b) standard:

75. More particularly, beginning in 1984 and thereafter, the Defendants, and each of them, in furtherance of their scheme to defraud Plaintiffs, used or caused to be used on two or more occasions, in the conduct of the affairs of the Corporation, mail delivered by the United States Postal Service in violation of 18 U.S.C. Section 1343. Among the materials which were sent through the United States mails in furtherance of the scheme to defraud Plaintiffs were advertisements, purported financial "reports" and projections.

\* \* \* \* \* \*

77. Specifically, the aforesaid pattern of racketeering activity and fraudulent scheming included certain representations made by Joseph and Peyson to one George Clark ("Clark"), among others, in order to fraudulently induce Clark to invest in Joseph's seminars. Clark invested $30,000.00 in Master–Sem in 1984 as a result of similar wrongful activities of Peyson and Joseph.

Those conclusory allegations do not provide any of the particularized information de-

scribed in the language that *Mutuelle Generale* quoted from *McKee*.

Accordingly ¶¶ 75 and 77 are stricken as insufficient in law. In all other respects, Joseph's Rule 9(b) motion is denied.

### *Federal Securities Claims*

1. *Section 10(b) Claim*

■ *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1553 n. 5 (N.D.Ill.1985) (citations omitted) summarized the components of a Section 10(b) claim:

To state a claim under Section 10(b) or Rule 10b–5, the plaintiff must allege the following elements: that the conduct complained about occurred in connection with the purchase or sale or securities ...; that the defendants misrepresented or omitted to state material facts ...; that plaintiff reasonably and justifiably relied, to his detriment, upon the misrepresentations or omissions ...; and that defendants acted with scienter....

Although some of those elements have since been given added substantive content (discussed later in this section), the quoted language remains a good checklist of the necessary components. Each of those components is present here.

Certainly the claimed misrepresentations were made "in connection with" Flournoys' purchase of the securities.[7] They went to the value of the security itself and thus present a "paradigm § 10(b) and Rule 10b–5 situation" (*Carter v. Signode Industries, Inc.*, 694 F.Supp. 493, 497 (N.D.Ill. 1988); cf. *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) ("Section 10(b) must be read flexibly, not technically and restrictively")).

To jump to the last element of a Section 10(b) claim (because it too calls for little discussion), the Complaint also properly alleges scienter: the intent to defraud (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96

---

6. While the Complaint does not identify the exact time and place of Peyson's misrepresentations, it does provide a reasonably narrow time frame in which they occurred. That is enough to permit an informed answer.

7. Of course Joseph does not challenge Flournoys' allegation that the stock of Miami Investment and Master–Sem are "securities" within the 1933 and 1934 Act definitions.

S.Ct. 1375, 47 L.Ed.2d 668 (1976)) or reckless disregard for the truth of representations (*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40 (7th Cir. 1977)). Flournoys specifically assert the representations "were made with the intent to deceive Plaintiffs, and were known to be untrue, or were made ... with a willful and reckless disregard for the truth" (¶ 53).

As for the elements of materiality and reliance, *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir.1988) teaches:

> Courts have traditionally held that a plaintiff's reliance must be reasonable or "justifiable." *See* Thomas Hazen, *Securities Regulation* § 13.5, at 464–65. But in *Flamm v. Eberstadt*, 814 F.2d 1169 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987), we stated that " 'reliance' means only materiality and causation in conjunction," and that reliance is no longer "an element independent of causation and materiality in a case under Rule 10b–5." *Id.* at 1173, 1174; *see also Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 527–30 (7th Cir.1985).

Although both materiality and causation require somewhat more extended treatment here, neither presents any real difficulty.

Joseph's participation must be viewed for present purposes as the equivalent of his having joined in Peyson's misrepresentations. First Joseph told Flournoys Peyson had a "good" investment opportunity (¶ 49). Then Peyson, with Joseph's knowledge, described the relationship between Joseph's seminars and the investment vehicles and later made the critical misstatement that "guaranteed" Flournoys would earn "at least a 100% profit in a short time" (¶ 11). It is a reasonable inference from the Complaint that Joseph and Peyson, acting together, engaged in a volleyball-like scheme: Joseph "set up" Flournoys by introducing and vouching for Peyson, then Peyson provided the "spike" with his misstatement.

*Rowe,* 850 F.2d at 1233 (drawing on *Basic, Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)) puts the materiality component in these terms:

> An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell.

Plainly the Joseph–Peyson statements were material to Flournoys' investment decision. Any reasonable investor in Flournoys' position would have considered those statements significant in deciding whether to buy the stock. In context they were "material" under Rule 10b–5 principles.

But that characterization must not gloss over the need to find the material statements were of "fact." Some case law has contrasted actionable misstatements of fact with nonactionable mere opinion or "puffing" (see, e.g., *Campo v. Shearson Hayden Stone, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 97,517, at 97,726 (S.D.N.Y.1980) [1981 WL 3417] (statement that plaintiff "could make a lot of money if he invested in options" was "at worst, an example of brokers' 'puffing' which does not rise to the level of actionable wrong under the federal securities laws") and cases cited therein). But Loss, *Fundamentals of Securities Regulation* 717 (2d ed. 1988) (footnotes omitted) tells us the concept of "puffing" has been generally rejected in the federal securities context:

> [E]stimates or statements of prospects are regarded as misrepresentations of fact if they are lacking in foundation....

> All this is to say that there is no longer much room for judicial predilection in drawing the line between misrepresentation and "puffing"; for the "puffing" concept in the securities context has all but gone the way of the dodo.

Indeed the SEC has said in *B. Fennekohl & Co.*, 41 S.E.C. 210, 216 (1962):

> The concept of "puffing" is derived from the doctrine of *caveat emptor* and arises primarily in the sale of tangibles where it appears that examination by the purchaser may offset exaggerated statements and expressions of opinion by the salesman. It can have little application to the merchandising of securities.

In all events a representation that "guarantees" investors "at least a 100% profit in a short time" must be viewed as one of *fact*. And its materiality has already been shown.

That leads to the final element: causation, comprising both "transaction causation" and "loss causation." As *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988) explains:

> "Loss causation" means that the investor would not have suffered a loss if the facts were what he believed them to be; "transaction causation" means that the investor would not have engaged in the transaction had the other party made truthful statements at the time required.

Because those terms have proved confusing in their application, *LHLC, id.* (emphasis in original) suggests "the appropriate inquiry is whether the information disclosed or withheld affected an *investment* decision."

Surely that gets a "yes" answer here. Flournoys' decision to buy stock in the two defunct corporations was directly traceable to the misstatements. No matter what terminology is employed, causation was present.

■ In sum, the Complaint adequately alleges all necessary elements of a Section 10(b) cause of action. Only one of Flournoys' two Section 10(b) claims is sustainable, however—the other is barred by the statute of limitations. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452, 455–56 (7th Cir.1987) has reconfirmed the applicability to Section 10(b) actions of the Illinois three-year limitations period for securities fraud claims. In this case Flournoys bought their Miami Investment shares May 17, 1984, yet waited until May 27, 1987 to file suit. Their claim based on that purchase must be and is dismissed.[8] Only the Master–Sem claim survives.[9]

■ In a separate Count VII, Flournoys assert a claim against Joseph for aiding and abetting all the securities laws violations. Our Court of Appeals recognizes Section 10(b) liability for aiders, abetters and conspirators with those primarily liable (see, e.g., *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir.1986)). And because Flournoys might lose on the merits of their claim against Joseph as a primary wrongdoer and yet prevail on the theory that Joseph had aided and abetted primary violator Peyson, the just-completed analysis does not moot the Count VII claim.

In substantive terms, *Barker, id.* at 495–96 teaches the aiding-and-abetting analysis follows the same path as the analysis for primary liability. Here too, then, the Master–Sem claim survives while the Miami Investment claim does not.

### 2. *Section 17(a) Claim*

■ Joseph Mem. 4 says Flournoys' Section 17(a) claim "should be dismissed as being contra to the law in this Circuit"—presumably an assertion that no private right of action exists under Section 17(a).[10] There is of course case law so holding, including the decision by this Court's colleague, Honorable Ilana Rovner, in *Beck*, 621 F.Supp. at 1558–60. But as for "the law in this Circuit," Joseph has made an-

---

8. Nothing in the Complaint suggests any basis for tolling the statute, so this opinion is not called upon to treat that issue. But *Teamsters, id.* at 456 affirmed this Court's views as to the narrow scope of the tolling doctrine (624 F.Supp. 959, 963–65 (N.D.Ill.1985)) as well as on the limitations question itself (*id.* at 962 & n. 7), so any tolling argument here would be doubtful at best.

9. Given the somewhat disjointed way in which the current motion has been tendered to this Court (see n. 10), it is not wholly clear whether Joseph has been relying on a limitations defense in this area. This opinion has been prepared on the premise that such a defense has not been waived.

10. Because of the way the motions have been tendered (two short memoranda in which Joseph "reincorporated by reference" the case citations in his prior motions, coupled with the delivery to this Court of copies of the memoranda Joseph and other defendants filed in *Clark*), it is not always easy to tell exactly what the parties' arguments are. But the paper blizzard has been read and every effort has been made to examine all the arguments advanced.

other misrepresentation of material fact—for another decision in *Teamsters Fund v. Angelos*, 762 F.2d 522, 530–31 (7th Cir. 1985) tells us otherwise:

> In saying this, we do not pass on a question that is open in this circuit—whether there is a private right of action to enforce § 17(a). See *Peoria Union Stock Yards Co. v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 323–24 (7th Cir. 1983). We held in *Daniel v. Teamsters*, 561 F.2d 1223, 1244–46 (7th Cir.1977), *rev'd on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), that there is such an action. But the Court's reversal of our judgment, coupled with its express refusal to decide the § 17(a) issue, 439 U.S. at 557 n. 9, 99 S.Ct. at 795 n. 9, removed the authority of the discussion in *Daniel*. Since then the Court has altered the standards for implying private rights of action and pointedly declined to address the § 17(a) issue. *Herman & MacLean* [*v. Huddleston*], *supra*, 459 U.S. [375] at 378 n. 2, 103 S.Ct. [683] at 685 n. 2 [74 L.Ed.2d 548 (1983)]. Our court has not considered the issue after *Daniel*, and we do not do so now. We indicated in *Penn Mutual* that in a case in which a Rule 10b-5 action is available, there is no reason to think that a § 17(a) action would have different elements, and the claim therefore adds nothing to plaintiff's arsenal. The Fund has not argued that a private party gets the benefit of the holding in *Aaron* that §§ 17(a)(2) and (3) do not require wilful misconduct. Here, as in *Penn Mutual*, the suit should proceed as if only a Rule 10b-5 claim had been raised.

As this Court has done on prior occasions, it follows *Angelos'* counseling and declines to address the Section 17(a) issue or, of course, the corresponding aiding and abetting issue. Those claims add nothing to Flournoys' Complaint, and there is no occasion to reach out to decide the question unnecessarily. Only one point is beyond dispute: Under the 1987 decision in *Teamsters Fund v. Angelos*, 815 F.2d at 455–56, any Section 17(a) claim based on the Miami Investment purchase, like its Section 10(b) counterpart, is barred by limitations.

### 3. *Section 12(2)*

■ Section 12(2) imposes liability where the same kind of misrepresentation or omission that would be actionable in a Section 10(b) claim is made "by means of a prospectus or oral communication" by "any person who offers or sells a security" in a transaction implicating interstate commerce or the mails. On that score Joseph Mem. 4 says Section 12(2) requires "strict privity" between purchasers and sellers, and he did not "offer[ ] or sell[ ]" securities to Flournoys.

In this area Joseph has been overtaken by events. Whatever currency the doctrine of strict privity may have enjoyed before this year has been cut short by *Pinter v. Dahl*, — U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). There the Supreme Court (*id.* 108 S.Ct. at 2077) (all citations other than that to Judge Rovner's *Beck* opinion omitted) expressly rejected the notion that seller-buyer privity is a necessary condition to liability under Section 12(1):

> Several courts and commentators have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security. *E.g.*, *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1560–61 (N.D.Ill.1985); ... In effect, these authorities interpret the term "purchase" as complementary to only the term "sell" defined in § 2(8). Thus, an offeror, as defined by § 2(8), may incur § 12 liability only if the offeror also "sells" the security to the plaintiff, in the sense of transferring title for value ...
>
> We do not read § 12(1) so restrictively.

\* \* \* \* \* \*

> The requirement [of a sale] does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place. A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase.

Hence the Court concluded (*id.* 108 S.Ct. at 2079) (footnote omitted):

The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and to align him with the owner in a rescission action.

To be sure, *Pinter* did not take a position on "the scope of a statutory seller for purposes of § 12(2)" (*id.* at 2076 n. 20)—an issue not presented for decision there. But the relevant statutory language ("any person who offers or sells a security") is common to the two provisions, and *Pinter, id.* observed:

> Most courts and commentators have not defined the defendant class differently for purposes of the two provisions.[11]

This Court finds no reason to read Section 12(2) differently. It opts for application of the *Pinter* analysis to Flournoys' Section 12(2) claim.

In those terms Joseph might well qualify for Section 12(2) liability. Through JRE he was entitled to receive between 6% and 12% of the gross revenues generated by Master–Sem (¶¶ 12, 15). That could arguably meet the *Pinter* notion of "serv[ing] his own financial interests" via the sale of Master–Sem stock (even though all that was involved in the Peyson–Flournoys sale was a broadening of the shareholder base, rather than added funds for the corporation itself).[12] And he certainly "solicited" Flournoys' purchase of securities: His statement that Peyson had a "good" investment opportunity, when viewed in the context of the entire scheme, fits that description.[13] In short, Joseph cannot rely with total comfort on the absence of privity

("strict" or otherwise) to avoid Section 12(2) liability.

■ But this opinion need not resolve the issue in those terms. Joseph successfully finds another escape hatch in Flournoys' failure to plead compliance with the statute of limitations. 1933 Act § 13 (15 U.S.C. § 77m) provides a dual limitations period for Section 12(2) claims:

> one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, [but] ... [i]n no event ... more than three years after the sale.

As this Court noted in *Gutfreund v. Christoph*, 658 F.Supp. 1378, 1387 (N.D.Ill.1987), compliance with those limitations periods must be affirmatively alleged.

Flournoys do not plead facts showing such compliance, but simply parrot the Section 13 language (¶ 59):

> This action has been commenced within three years of the date of sale of the securities in question and within one year from the date of discovery by the Plaintiffs of the Defendants' untrue statements.

While some courts find such conclusory allegations necessarily insufficient to withstand Rule 12(b)(6) dismissal (see, e.g., *Hagert v. Glickman, Lurie, Eiger & Co.*, 520 F.Supp. 1028, 1033 (D.Minn.1981)), this Court applies no such per se rule. Instead it has always analyzed the issue in terms of whether the allegation is "well-pleaded" for Rule 12(b)(6) purposes (see n. 3).

In this instance ¶ 59 fails that test. Nothing said elsewhere in the Complaint even hints at a reason that the misrepresentations should not have been known to Flournoys long before May 28, 1986 (one

---

**11.** [Footnote by this Court] It is worth noting the SEC has since taken the position that *Pinter* governs actions brought under Section 12(2) (see Fed.Sec.L.Rep. (CCH) No. 1310, at 3 (Nov. 2, 1988)).

**12.** It is unnecessary that Joseph have received any proceeds of such stock sales (presumably he did not). It is enough that the sales promoted the viability of Master–Sem, in which Joseph had a direct stake.

**13.** *Pinter*'s reference to "persons who urged the buyer to purchase" finds its counterpart in at least two *Webster's Third New International Dictionary* (1976) definitions of "solicit" (*id.* 108 S.Ct. at 2169):

> 4. to move to action: serve as an urge or incentive to
> 5. to strongly urge (as one's cause or point)

year before suit was filed). After all, both stock transactions were entered into two years before *that,* in May 1984.[14]

Thus, although Joseph is potentially liable under Section 12(2), Flournoys have failed to plead a timely claim. Joseph's motion to dismiss the Section 12(2) claim is therefore granted.[15]

### RICO Claims

■ Flournoys assert violations of RICO Sections 1962(a), 1962(c) and 1962(d). Joseph Mem. 4 first challenges the existence of a pattern of racketeering activity, an essential element of every RICO claim. This section therefore begins by examining the sufficiency of the Complaint's pattern allegations.[16]

"Pattern" analysis has been pretty much the order of the RICO day since the issuance of now-famous footnote 14 in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) (in part emphasizing it is "continuity plus relationship which combines to produce a pattern"). Now it is at most a matter of months until new light will be shed on the subject by the Supreme Court in *H.J., Inc. v. Northwestern Bell Telephone Co.,* No. 87–1252, 1988 Term (cert. granted to the Court of Appeals for the Eighth Circuit, whose 1987 decision is reported at 829 F.2d 648). Oral argument in *H.J.* took place November 8, 1988 (see 57 U.S.L.W. 3358–59 for a brief account of the oral argument).

In the meantime, however, this Court will continue to follow the type of "fact-specific analysis" marked out by our Court of Appeals in a series of cases—most recently its affirmance of this Court in *Brandt v. Schal Associates, Inc.,* 854 F.2d

948, 952 (7th Cir.1988). There the court said, quoting from its earlier decision in *Jones v. Lampe,* 845 F.2d 755, 757 (7th Cir.1988):

> Among the relevant factors are: "(1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries."

Though any formulaic approach to the problem runs the risk of being oversimplistic, it remains useful to contrast "multiple acts in furtherance of a single episode of fraud ... against a single victim" (*Brandt,* 854 F.2d at 952) (not a pattern) with predicate acts that "involve multiple injuries, multiple victims or multiple schemes" (*id.* at 953) (a pattern).

Here ¶ 76 alleges the earlier-identified Peyson–Joseph misstatements in connection with Flournoys' purchase of both Miami Investment and Master–Sem shares were the predicate acts of "racketeering activity" (and of course securities fraud is a species of such activity under Section 1961(1)(D)). For that purpose, the drawing of inferences reasonably favorable to Flournoys justifies imposing joint responsibility on Joseph for Peyson's key assurance of "at least a 100% return," as well as for Joseph's own initial vouching for Peyson. In terms of the *Brandt* reference to "multiple injuries, multiple victims or multiple schemes," the charged fraudulent activity certainly involved the first of those and perhaps the third as well: Flournoys purchased securities in two different corporations on two different dates (shares in Miami Investment on May 17 and shares in Master–Sem on May 29).[17]

14. Indeed the Miami Investment transaction (a May 17, 1984 purchase) is outside the three-year branch of Section 13 as well.

15. Of course that also spells dismissal of Complaint Count VII to the extent it charges Joseph with a Section 12(2) violation. It is thus unnecessary to consider the viability of any such claim (cf. *Pinter,* 108 S.Ct. at 2079 n. 24).

16. Because ¶¶ 75 and 77 have already been stricken for insufficient particularity, those alle-

gations have been ignored in analyzing the pattern issue.

17. If Flournoys were to salvage ¶ 77 by repleading with particularity as to George Clark's having been defrauded into a Master–Sem stock purchase too (a likely prospect in light of the existing complaint in *Clark* ), that would qualify in "multiple victims" terms as well. For "pattern" purposes it is sufficient if a plaintiff has been victimized by only part of the racketeering activity pattern, while others have been the victims of other conduct within the pattern (see,

Flournoys have thus adequately alleged a "pattern of racketeering" for RICO purposes. This opinion turns to the substantive requirements of the various RICO provisions.

### 1. *Section 1962(a)*

■ Section 1962(a) makes it unlawful for "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in ... the operation of, any enterprise...." Section 1964(c) in turn provides a cause of action to anyone injured in his business or property "by reason of" any violation of Section 1962.

Flournoys' counsel reflect at least partial awareness of their clients' obvious difficulty in fitting into that format for liability. They have included an unfocused allegation that (¶ 17):

> Joseph, personally or through JRE, received funds from the operation of Master Sem or Miami.

But that generalized assertion does not attain the level of a "well-pleaded" allegation.

First of all, Flournoys bought their Miami Investment and Master–Sem stock from *Peyson* (Complaint Exs. A and B). Moreover, there is no allegation of any later deal by which money changed hands between Peyson and Joseph. Hence no basis exists for ascribing to Joseph any receipt of income from the transactions that victimized Flournoys.[18] And that means Joseph was not involved in even the first step of such a violation of Section 1962(a).

As if that were not enough (and it is), there is also no hint as to Joseph's having used or invested any racketeering-derived income (if there were any) in any enterprise—whether Master–Sem, Miami Investment or even Peyson individually—or as to such use or investment (if there were any) hav-

ing then injured Flournoys. As this Court pointed out in *P.M.F. Services, Inc. v. Grady*, 681 F.Supp. 549, 555 (N.D.Ill.1988), in order to satisfy the "by reason of" language in a Section 1962(a) claim, Flournoys must allege they were harmed by the later use or investment back into the enterprise of income previously derived by Joseph from racketeering activity. Flournoys do not meet that requirement either.

Flournoys' attempt to assert a Section 1962(a) claim therefore fails on several levels. Joseph's motion to dismiss that claim is granted.

### 2. *Section 1962(c)*

■ Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *United States v. Yonan*, 800 F.2d 164, 167–68 (7th Cir.1986) teaches the "association" element may be satisfied by a relationship between the defendant and the business of the "enterprise."

In this case, given the fact that the "pattern of racketeering activity" consists of securities fraud in which Peyson was the direct seller, the only "enterprise" whose affairs were conducted through that pattern was Peyson himself (RICO § 1961(4) says an individual can be an "enterprise"). And given the interrelationship among Peyson and his corporations, plus the specifically-alleged deal between Joseph and Master–Sem, at least at this threshold stage of the litigation the loose concept of an "association" between Joseph and Peyson may reasonably be inferred. Finally:

> 1. Joseph participated in the conduct of Peyson's affairs through the securities-fraud "pattern" when he touted Peyson's investment to Flournoys.

e.g., *Papagiannis v. Pontikis,* 108 F.R.D. 177, 179 (N.D.Ill.1985)).

**18.** This Court has not forgotten the ¶ 15 allegation that "Master–Sem was supposed to pay Joseph between six (6) and twelve (12) percent of gross revenues." But there is nothing to suggest

such payments (if made at all) were "income derived, directly or indirectly, from [the] pattern of racketeering activity" that injured Flournoys: Peyson's sales to them of *his* stock in the two corporations. After all, such sales put dollars into Peyson's pockets, not Master–Sem's.

2. Flournoys were injured by that violation of Section 1962(c)—that's what this lawsuit is all about.

It follows that Flournoys' Section 1962(c) claim withstands dismissal as a pleading matter.

### 3. *Section 1962(d)*

██ Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." All ¶ 84 says on that score is that Peyson and Joseph:

1. "assented to and participated in the furtherance of the violations of Section 1962(a) and (c)" and

2. "were each participants in a conspiracy in violation of Section 1962(d)."

Once again it simply will not suffice to state such ultimate conclusions and leave it to this Court to sort out the elements of the claim. For example, on the pleadings Peyson is the only Section 1962(c) "enterprise" —so he cannot also be a Section 1962(c) "person" (*Haroco v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 399–401 (7th Cir.1984), approving this Court's opinion in *Parnes v. Heinold Commodities*, 548 F.Supp. 20, 23–24 (N.D.Ill. 1982)).[19] Neither side has addressed the question whether a person-with-nonperson or a person-with-enterprise combination can be a Section 1962(d) conspiracy. Nor have Flournoys fleshed out any of the facts (as contrasted with the ultimate conclusions) establishing the elements of the alleged conspiracy to permit an informed analysis of the claim.

---

**19.** It takes only a moment's reflection to realize neither corporation may be viewed as the Section 1962(c) "enterprise" in the factual matrix presented by the Complaint. Yet Flournoys' counsel have not taken even that moment to reflect, for their only lame effort at the issue is this garbled version (¶ 73):

Defendants' promotion and sale of securities in Master–Sem and Miami constitutes an enterprise within the meaning of 18 U.S.C. Section 1961(4). At all times relevant to the Complaint, Master–Sem and Miami engaged in, or its activities affected, interstate or foreign commerce.

And ¶ 74 makes it plain that counsel think of Master–Sem and Miami as the "enterprise." In this instance they are fortunate that Rule 12(b)(6) determinations are based on the *facts*

At this stage Flournoys have therefore not established the existence of a Section 1962(d) claim. It too is dismissed.

### *State Law Claims*

### 1. *Common Law Fraud*

██ Flournoys assert two claims of common law fraud against Joseph: one against Peyson and Joseph together (Count I), the other against Joseph individually (Count III).[20] What has become the definitive Illinois statement of the elements of such a claim is found in *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) (citations omitted):

(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.... Furthermore, the reliance by the other party must be justified, *i.e.*, he must have had a right to rely.

Indeed, as stated in *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 332, 13 Ill. Dec. 699, 705, 371 N.E.2d 634, 640 (1977):

Misrepresentation of an existing material fact coupled with scienter, deception, and injury are more than adequate.

This opinion has several times identified the two false statements specified in the Complaint:

---

alleged in a complaint, not on the lawyers' conceptualizations of the legal theories those facts can support (see *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

**20.** Still another count alleges fraud by Peyson alone (Count II). It is unclear why Flournoys have chosen such a splintering of claims. They cite *Vance Pearson, Inc. v. Alexander*, 86 Ill.App. 3d 1105, 42 Ill.Dec. 204, 408 N.E.2d 782 (4th Dist.1980) for the proposition that "Illinois recognizes a cause of action where a *scheme to defraud* was perpetrated." True enough, but the analysis is no different for two defendants than for one. This opinion consequently applies traditional common law fraud analysis for both Joseph-linked counts.

1. Joseph's that Peyson had a "good" investment opportunity; and

2. Peyson's that "guaranteed" Flournoys "at least a 100% profit in a short time."

Though expressed in the present tense, the first of those is really a statement about future investment performance. As for the second, it is plainly a promise about what will happen rather than about an "existing material fact."

It follows that the complained-of statements could be labeled in a way that Illinois law has traditionally held nonactionable. But this Court has often noted the recognized *Steinberg* exception to that rule "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud" (see, e.g., *McCarthy v. PaineWebber, Inc.*, 618 F.Supp. 933, 941 (N.D.Ill.1985), quoting *Steinberg*, 69 Ill.2d at 334, 13 Ill.Dec. at 706, 371 N.E.2d at 641).[21] That is the case here, for it was the misstatements themselves that induced Flournoys to invest. They *were* the "scheme employed."

All the remaining *Steinberg*-identified elements—scienter, deception and injury—are also adequately alleged in the Complaint (¶¶ 13–14, 28–30). There is no predicate for dismissal of the common-law fraud claims, and Joseph's motion is denied in that respect.

2. *Illinois Securities Fraud and Illinois Consumer Fraud and Deceptive Business Practices Act*

Flournoys assert state law claims for both securities fraud and consumer fraud. Neither party has briefed those issues in any meaningful way. This opinion has already done a substantial part of the lawyering in the case where counsel do not really seem to have grasped the issues (the RICO discussion is perhaps the best illustration). But this Court is disinclined to do that essentially from scratch, as would be required as to these last two claims. Accordingly no opinion is expressed, one way

or the other, on Joseph's motion to dismiss in this respect.

*Conclusion*

With the exception of two RICO-based allegations, the Complaint does plead fraud with the requisite particularity. But because ¶¶ 75 and 77 do not satisfy Rule 9(b)'s requirements, those two paragraphs are stricken. In all other respects Joseph's motion to dismiss the Complaint under Rule 9(b) is denied.

Flournoys have stated a viable federal securities law claim under Section 10(b), and jurisprudential considerations counsel no decision as to their Section 17(a) claim. Joseph's motion to dismiss those claims is therefore granted as to the time-barred Miami Investment purchase but denied as to the Master–Sem purchase. However, the entire Section 12(2) claim is barred by limitations and is dismissed. Each aiding and abetting claim follows the same path as the corresponding claim for direct liability.

Flournoys do not state claims under Sections 1962(a) and 1962(d), and they are dismissed. Section 1962(c) is another matter, however, and that claim will stand.

All elements of Illinois common-law fraud are "well-pleaded" in the legal sense. Those claims withstand dismissal.

Finally, no opinion is expressed as to the insufficiently-briefed issues affecting the claims advanced under the Illinois securities laws or the Illinois consumer fraud statute. Those claims stand for the present.

Although Flournoys might well be sent back to the drawing boards to produce a self-contained amended complaint without the dismissed claims and stricken allegations, this case has lain fallow far too long already. Joseph is ordered to answer the surviving portions of the Complaint on or before December 19, 1988. This action is

---

**21.** As this Court invariably observes in treating with this subject matter, the hazard that must be guarded against is permitting the exception to swallow up the rule entirely. That risk is not presented by the allegations in this case.

set for a status hearing at 9 a.m. December 27, 1988.